NO. 20-50238

―――――――――――――――――――――――

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

―――――

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

RAYMOND J. LIDDY,

Defendant-Appellant.

―――――

Appeal from the United States District Court
for the Southern District of California
Honorable Cathy A. Bencivengo, District Judge Presiding

―――――
―――――

APPELLANT'S OPENING BRIEF

―――――
―――――

DEVIN BURSTEIN
Warren & Burstein
501 West Broadway, Suite 240
San Diego, CA 92101
(619) 234-4433

Attorneys for Defendant-Appellant

## TABLE OF CONTENTS

INTRODUCTION ............................................................................ 1

JURISDICTIONAL STATEMENT .............................................. 4

DETENTION STATUS ................................................................. 4

STATUTORY AND REGULATORY PROVISIONS ................... 5

ISSUES FOR REVIEW ................................................................. 5

STATEMENT OF THE CASE ...................................................... 5

    A.    The man before the Court ................................................ 5
    B.    Mr. Liddy's Internet use ................................................ 7
    C.    The investigation ............................................................ 9
    D.    The pretrial proceedings .............................................. 11
    E.    The trial ......................................................................... 14
    F.    The conviction and new trial motion ......................... 22

SUMMARY OF ARGUMENT ..................................................... 24

ARGUMENT ................................................................................ 26

I.     Standards of review .................................................................... 26

II.    The evidence was insufficient to support the conviction .............. 27

    A.    The government failed to prove Mr. Liddy knew the subject files depicted child pornography ........................................... 27
    B.    This Court's *Flyer* opinion is dispositive .............................. 29
    C.    The district court's flawed analysis ...................................... 32
           1.    The district court's "transfer over" theory was unsupported by the evidence ........................................ 33

2. The district court's misplaced reliance on Mr. Liddy's pre-*Miranda* statements ............................................... 35

III. The district court erred in denying Mr. Liddy's motion for a new trial ............................................................................ 37

A. Relevant facts ................................................................ 38
  1. The defense repeatedly explained what it believed was the agreed-upon state of the evidence ......................... 38
  2. Mr. Liddy waived his right to a jury based on material misinformation about the prosecution's evidence ....... 40
B. Mr. Liddy's invalid jury waiver .................................... 43
  1. Relevant legal principles ............................................. 43
  2. Mr. Liddy's jury waiver was not intelligently made ... 44

IV. The district court erred in denying Mr. Liddy's suppression motions ............................................................................... 46

A. The government's warrantless search of Mr. Liddy's subscriber information violated the Fourth Amendment .... 46
  1. Relevant facts ............................................................. 47
  2. *Carpenter* ................................................................. 49
  3. *Carpenter*'s analysis is controlling ............................ 51
     a. Mr. Liddy's Fourth Amendment interest in the subscriber information ........................................ 51
     b. The third-party doctrine cannot justify the warrantless search ............................................. 56
  4. Suppression is the appropriate remedy ....................... 59
B. The district court erred in failing to suppress Mr. Liddy's pre-*Miranda* statements .............................................. 62
  1. Relevant facts ............................................................. 62
  2. The interrogation was custodial .................................. 66
     a. The reasonable person standard for in-home interrogations ...................................................... 66
     b. A reasonable person in Mr. Liddy's position would not have felt free to leave .................................... 67
     c. *Craighead* is dispositive for Mr. Liddy .............. 69

CONCLUSION ........................................................................ 74

CERTIFICATE OF RELATED CASES .................................................. 75

CERTIFICATE OF COMPLIANCE

ADDENDUM

## TABLE OF AUTHORITIES

### Federal Cases

*Adams v. United States ex rel. McCann,*
  317 U.S. 269 (1942) ...................................................... 43, 44

*Arizona v. Hicks,*
  480 U.S. 321 (1987) .......................................................... 54

*Carpenter v. United States,*
  138 S. Ct. 2206 (2018) ............................................. *passim*

*Doody v. Ryan,*
  649 F.3d 986 (9th Cir. 2011) (en banc) ............................ 66

*Illinois v. Krull,*
  480 U.S. 340 (1987) .......................................................... 61

*In re Winship,*
  397 U.S. 358 (1970) .......................................................... 37

*J.D.B. v. North Carolina,*
  564 U.S. 261 (2011) .......................................................... 67

*Katz v. United States,*
  389 U.S. 347 (1967) .......................................................... 52

*Kelly v. Arriba Soft Corp.,*
  336 F.3d 811 (9th Cir. 2003) ............................................. 7

*Kyles v. Whitley,*
  514 U.S. 419, 446 n. 15 (1995) ........................................ 42

*Kyllo v. United States,*
  533 U.S. 27 (2001) ..................................................... 53, 57

*Miranda v. Arizona,*
  384 U.S. 436 (1966) ................................................. *passim*

*Patton v. United States,*
  281 U.S. 276 (1930) .......................................................... 43

*Payton v. New York,*
    445 U.S. 573 (1980) ............................................................. 56

*Riley v. California,*
    573 U.S. 373 (2014) ............................................... 56, 57, 59

*Thompson v. Keohane,*
    516 U.S. 99 (1995) ............................................................. 66

*United States ex. rel. Williams v. De Robertis,*
    715 F.2d 1174 (7th Cir. 1983) .......................................... 44

*United States v. Battershell,*
    457 F.3d 1048 (9th Cir. 2006) ............................................ 7

*United States v. Beraun-Panez,*
    812 F.2d 578 (9th Cir. 1987) ............................................. 71

*United States v. Cervantes,*
    703 F.3d 1135 (9th Cir. 2012) .......................................... 47

*United States v. Craighead,*
    539 F.3d 1073 (9th Cir. 2008) .................................. *passim*

*United States v. Davis,*
    428 F.3d 802 (9th Cir. 2005) ........................................... 45

*United States v. Dobbs,*
    629 F.3d 1199 (10th Cir. 2011) ........................................ 31

*United States v. Flyer,*
    633 F.3d 911 (9th Cir. 2010) .................................... *passim*

*United States v. Hardick,*
    766 F.3d 1051 (9th Cir. 2014) .......................................... 34

*United States v. Hernandez,*
    203 F.3d 614 (9th Cir. 2000) .............................. 44, 45, 46

*United States v. Hernandez-Orellana,*
    539 F.3d 994 (9th Cir. 2008) ........................................... 26

*United States v. Job,*
    871 F.3d 852 (9th Cir. 2017) ............................................................. 26

*United States v. Jones,*
    565 U.S. 400 (2012) ...................................................................... 52, 54

*United States v. Kohring,*
    637 F.3d 895 (9th Cir. 2011) ............................................................. 42

*United States v. Kuchinski,*
    469 F.3d 853 (9th Cir. 2006) ............................................................. 31

*United States v. Lacy,*
    119 F.3d 742 (9th Cir. 1997) ............................................................. 28

*United States v. Laney,*
    881 F.3d 1100 (9th Cir. 2018) ................................................... *passim*

*United States v. Lopez,*
    484 F.3d 1186 (9th Cir. 2007) ............................................................. 33

*United States v. Lowe,*
    795 F.3d 519 (6th Cir. 2015) ....................................................... 36, 37

*United States v. Moreland,*
    665 F.3d 137 (5th Cir. 2011) ............................................................. 31

*United States v. Murillo,*
    288 F.3d 1126 (9th Cir. 2002) ............................................................. 26

*United States v. Pothier,*
    919 F.3d 143 (1st. Cir. 2019) ............................................................. 36

*United States v. Romm,*
    455 F.3d 990 (9th Cir. 2006) ............................................................. 34

*United States v. Shorty,*
    741 F.3d 961 (9th Cir. 2013) ....................................................... 26, 45

*United States v. Vasey,*
    834 F.2d 782 (9th Cir. 1987) ............................................................. 60

vii

*United States v. Weber*,
  923 F.2d 1338 (9th Cir. 1990) ................................................. 33, 60, 61

*United States v. X-Citement Video*,
  513 U.S. 64 (1994) ................................................................... 28

## State Cases

*People v. Saldana*,
  19 Cal. App. 5th 432 (2018) ..................................................... 73

## Federal Statutes

18 U.S.C. § 2252(a)(4)(B) ........................................................ 11, 27

18 U.S.C. § 2258A(a) .............................................................. 9

18 U.S.C. § 2703(c)(2) ........................................................... 55

18 U.S.C. § 3231 ................................................................. 4

28 U.S.C. § 1291 ................................................................. 4

## Federal Rules

Fed. R. Crim. P. 16(a)(1)(G) .................................................... 39

Fed. R. Crim. P. 33 ............................................................. 43, 45

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, | C.A. No. 20-50238 |
| Plaintiff-Appellee, | D.C. No. 19-cr-01685-CAB<br>U.S. District Court for Southern<br>California, San Diego |
| v. | |
| RAYMOND J. LIDDY, | Appellant's opening brief |
| Defendant-Appellant. | |

## <u>INTRODUCTION</u>

This is a case about knowledge, its absence, and a failure of proof. It is also a case about invalid jury waivers, warrantless searches, and *Miranda* violations. While the issues are diverse, they are bound by a common thread: Mr. Liddy's conviction cannot stand.

Following a bench trial, the district court found Mr. Liddy guilty of knowingly possessing a few deleted, inaccessible digital files depicting child pornography. But there was no evidence he had *ever* opened, seen, or knew what these files contained. The expert testimony further revealed that, if he had accessed the files, there would likely have been some forensic record. There was not.

Nor was there any evidence Mr. Liddy ever sought child pornography on the Internet or anywhere else, requested child pornography be sent to him, collected child pornography, or shared it with others.  As the district court found, "there is no evidence he was out searching for it.  There is no search history . . . to show that he was looking for this material or sharing this material[.]"  6-ER-1340-41.

Nevertheless, the district court found Mr. Liddy guilty on a speculative theory that he must have viewed and saved the subject files on his desktop computer and then transferred them to a thumb drive before deleting them.  The government did not advance this theory; the district judge came up with it on her own.

The theory, however, was factually unsupported and legally flawed. The forensic experts found *no* indication Mr. Liddy had moved these files from one device to another or that they had ever been saved to his desktop computer.  Moreover, under *United States v. Flyer*, 633 F.3d 911, 918 (9th Cir. 2010), inaccessible files, like those at issue here, do not support a conviction for *knowingly* possessing child pornography.  Indeed, after the verdict, the district court seemed to acknowledge its shaky logic: "the

Ninth Circuit may disagree with my analysis of what constitutes possession in this case[.]" 5-ER-1086.

This Court should do exactly that. The evidence was insufficient. Mr. Liddy's conviction must be vacated.

Independently, reversal is required because Mr. Liddy's jury waiver was not intelligently made. It was based on material misinformation about the state of the evidence. Specifically, before trial, the government failed to disclose that its expert (erroneously) believed the subject files were active and accessible rather than deleted and inaccessible.

After his opinion was first revealed in the middle of trial, the defense objected, but rather than acknowledge its error, the government sought to block the defense expert from testifying in rebuttal. Only after losing that battle did the government withdraw its expert's flawed testimony.

But, by then, the damage had been done. The government's failure to disclose its expert's opinion fundamentally undermined the defense's cost-benefit analysis of a bench trial. And it caused Mr. Liddy to waive his constitutional right to a jury based on erroneous information about the credibility of the government's expert and its investigation. On this

3

basis, he moved the district court for a new trial. The district court denied the motion. That was error.

A waiver based on material misinformation is not intelligently made. An unintelligent waiver is invalid. And an invalid waiver is structural error, requiring a new trial.

The district court also erred in denying Mr. Liddy's motions to suppress: (a) the fruits of the government's warrantless search of his Internet subscriber information, and (b) Mr. Liddy's pre-*Miranda* statements. As explained below, each motion was meritorious, and the erroneous denials were prejudicial.

Accordingly, Mr. Liddy's conviction cannot stand.

## JURISDICTIONAL STATEMENT

The district court had original jurisdiction over the criminal offenses under 18 U.S.C. § 3231. This Court has jurisdiction over a timely appeal from a final order entered in the Southern District of California. *See* 28 U.S.C. § 1291; 1-ER-59; 6-ER-1363.

## DETENTION STATUS

Mr. Liddy is serving a five-year term of probation. He is required to register as a sex offender with the state of California for life. 6-ER-

4

1257-58.    Additionally,  his  ability  to  work  and  travel  are  heavily

restricted.  6-ER-1257-58.

## STATUTORY AND REGULATORY PROVISIONS

Copies of pertinent statutes and regulations appear in the attached

addendum.

## ISSUES FOR REVIEW

1.    Whether  the  evidence  was  sufficient  to  sustain  Mr.  Liddy's

conviction.

2.    Whether the district court erred in denying Mr. Liddy's motion for

a new trial.

3.    Whether the district court erred in denying Mr. Liddy's motions to

suppress: (a) the fruits of the warrantless search of his subscriber data,

and (b) his statements taken without *Miranda* warnings.

## STATEMENT OF THE CASE

The following factual recitation provides an overview of the case.

Additional facts are included within the relevant argument sections.

**A.**    **The man before the Court.**

It is impossible to tell Mr. Liddy's story without first mentioning

his infamous father, G. Gordon Liddy.  6-ER-1235.  The elder Mr. Liddy

5

was at the center of the Watergate scandal. 6-ER-1235. When the story broke, he became a villain to millions. 6-ER-1235.

The young Mr. Liddy and his family were scorned. 6-ER-1235-36. This fueled his desire to succeed and to serve. 6-ER-1236. In 1986, Mr. Liddy enlisted in the Marine Corps and soon deployed to combat in Panama as part of Operation Just Cause. 6-ER-1236. While there, he was nearly killed in an explosion, suffering burns over 14% of his body. 6-ER-1238.

He spent months recovering, but his commitment to country did not waiver. 6-ER-1238. He continued in the Marine Corps Reserves while attending law school. 6-ER-1240. After being recalled to active combat in Iraq several times, Mr. Liddy completed his degree. 6-ER-1240-41. He eventually worked as a Deputy Attorney General for California in the civil division (he never practiced criminal law). 6-ER-1211, 1243. At the same time, Mr. Liddy also maintained his military service. 6-ER-1241. He was ultimately promoted to full Colonel, his proudest achievement. 6-ER-1241.

As Mr. Liddy approached mandatory Marine Corps retirement, however, he grew depressed and felt a loss of purpose. 6-ER-1241. This

6

exacerbated his combat-related PTSD. 6-ER-1241. He sought help and was prescribed Ambien for his inability to sleep. 6-ER-1242. It did not fix the problem, so he began drinking at night after taking Ambien. 6-ER-1242. Inebriated, depressed, and still unable to sleep, Mr. Liddy turned to the Internet for a sense of connection. 6-ER-1242.

**B. Mr. Liddy's Internet use.**

He began frequenting *adult* chatrooms, where sexual topics were discussed, and users posted links to *adult* pornography. 4-ER-566; 5-ER-947-49. The users also frequently chatted on messaging platforms, such as Yahoo messenger and Skype. 5-ER-954, 958.

The chatrooms functioned like a tickertape. 4-ER-566. Messages continuously scrolled by with text, thumbnails,[1] or links. 4-ER-566. Mr. Liddy generally had numerous windows open at the same time, holding multiple conversations. 4-ER-566. It was too much to digest in real-time. 4-ER-566; 5-ER-961.

---

[1] A thumbnail is a small, low-resolution file; the details of the image are generally not discernable. 5-ER-917; *see Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 818-19 (9th Cir. 2003); *United States v. Battershell*, 457 F.3d 1048, 1049 (9th Cir. 2006).

As a result, Mr. Liddy would often right-click a thumbnail or a link and save the file *without* first viewing it or knowing what it depicted. 4-ER-566. Sometimes the links would result in mass-downloads of image files. 4-ER-566. Often Mr. Liddy would simply delete the downloaded files without reviewing them, feeling ashamed of his drunken conversations. 4-ER-566. Other times, he would open the files to see the pictures before deleting them. 4-ER-566. Almost always, it was adult pornography. 4-ER-566.

Occasionally, however, an image would reveal what appeared to be child pornography. 4-ER-566; 5-ER-969. He always deleted any such images. 4-ER-566; 5-ER-969. Moreover, as the forensic evidence would establish – and the district court found – Mr. Liddy never sought this contraband. 4-ER-566; 5-ER-965, 970; 6-ER-1340-41. One of the unique factors of this case is that there were *no* Internet searches for child pornography and *no* discussion of child pornography in the numerous chat messages recovered by the government. 6-ER-1340-41.

But algorithms do not differentiate between intentionality and inadvertence. Internet companies like Yahoo and Skype use special software to search their systems for contraband images. When the

8

software encounters such a file, the company must report the incident to the CyberTipline of the National Center for Missing and Exploited Children (NCMEC). *See* 18 U.S.C. § 2258A(a). Typically, the electronic report contains basic information about the user account and the suspect files. NCMEC then forwards the reports to law enforcement. 2-ER-100.

## C. The investigation.

In early 2017, NCMEC received reports from Yahoo and Microsoft (Skype), that their software encountered several images of child pornography on their systems.[2] 2-ER-72-92. The IP address associated with both reports was 76.88.66.25, and the associated account was "cahubby." 2-ER-74.

Several months later, "Department of Justice Administrative Subpoenas were served on Time Warner Cable seeking subscriber information for the customer utilizing the IP address 76.88.66.25[.]" 2-ER-100, 179-83. Time Warner responded by providing, among other information, the subscribers' identities and residential address. 2-ER-

---

[2] The companies intercepted the files and then uploaded them to NCMEC from their servers. 6-ER-1205, 1220. There was no evidence Mr. Liddy "uploaded" the files from his computer.

100, 185-90. Based on that information, the government concluded "cahubby" was Mr. Liddy and sought a search warrant for his home in San Diego, where he lived with his wife. 2-ER-100, 130.

Early in the morning of July 25, 2017, multiple armed agents executed the warrant. 3-ER-322. They questioned Mr. Liddy at length without providing *Miranda* warnings, telling him he was free to leave, or advising him that they were there to execute a warrant. 3-ER-323; 5-ER-943-92; R1 at 2:05.[3] In response, Mr. Liddy confirmed he engaged in Internet chats about sex. 3-ER-323; 5-ER-943-92; R1 at 5:30-25:25. He also acknowledged occasionally seeing child pornography and deleting it. 3-ER-323; 5-ER-943-92; R1 at 12:00-33:20.

After several hours, agents told Mr. Liddy they found a few (deleted and inaccessible) files containing child pornography on his devices and arrested him. 3-ER-325-26. The agents then seized all the digital media from the Liddy home for further forensic examination.

---

[3] Agents secretly recorded much of the interrogation. The recording was admitted below and will be lodged with this Court. The "R" citations refer to the recording number and relevant time-stamp.

This included an iOmega external hard drive, a Cruzer-16GB thumb drive, and a Cruzer-1GB thumb drive. 3-ER-574; 5-ER-1029.

There were *no accessible* contraband files found on any of the devices. 6-ER-1249. Instead, the government's subsequent examination with special forensic software revealed several deleted and/or inaccessible files depicting child pornography. 6-ER-1249.

## D.    The pretrial proceedings.

Despite the lack of active contraband files or any evidence that Mr. Liddy had searched for such content on the Internet, the government charged him with knowingly possessing child pornography, in violation of 18 U.S.C. § 2252(a)(4)(B). 2-ER-67; 3-ER-439.

Mr. Liddy moved to suppress, among other evidence: (a) the fruits of the warrantless search of his subscriber information, and (b) his pre-*Miranda* statements. 2-ER-68; 3-ER-320. The district court denied the motions. 1-ER-2-12, 27-34.

The court did grant Mr. Liddy's motion for a bill of particulars, directing the government to inform him of the specific image files underlying the charge. 3-ER-315-18; 6-ER-1372. The government provided a list of ten digital files on the three drives noted above: the

11

iOmega, the Cruzer-16GB, and the Cruzer-1GB. 3-ER-462-64; 5-ER-1029. None of the enumerated files were on the computer's internal hard drive.

From the outset, the defense believed the parties *agreed* that nine of the files (files 2 through 10) were located in unallocated space that could be accessed only with special forensic software,[4] and the remaining file (file 1) was inaccessible because it had a corrupt file extension.[5] 5-ER-1112-13.

In fact, throughout the pretrial proceedings, the defense repeatedly discussed with the government and the district court the fact that the objective forensic evidence established these files were inaccessible to Mr. Liddy, in unallocated space. 5-ER-1113-15. The government never

---

[4] "Unallocated space is space on a hard drive that contains deleted data, usually emptied from the operating system's trash or recycle bin folder, that cannot be seen or accessed by the user without the use of forensic software." *Flyer*, 633 F.3d at 918. Allocated space is occupied by active files accessible to the user. *See id.* Files in allocated space generally provide strong evidence of knowledge, whereas unallocated files do not. *See id.*

[5] This file, referred to below as JTF Panama or file 1, is irrelevant because it was not part of the verdict.

indicated any disagreement. Nor did it provide the requisite pretrial summary of its expert's, Robert Gerou's, testimony. 3-ER-527-28; 5-ER-1115.

Thus, at the time, the defense never suspected Gerou held a contrary (and erroneous) view the evidence; that he had been be unable to correctly determine whether the files were in allocated or unallocated space – the forensic equivalent of whether a light switch was on or off. 5-ER-1119. To the contrary, the defense concluded Gerou would testify that the subject files were in unallocated space, a crucial exculpatory point. 5-ER-1114-15, 1135. And with good reason: this was *a fact*, as everyone now recognizes.

It was not until the middle of trial that the government and Gerou first revealed his erroneous opinion that the subject files were readily accessible in allocated space. The government's lack of pretrial disclosure had significant consequences. Unaware of Gerou's mistaken view of the forensics, counsel advised Mr. Liddy to waive his constitutional right to a jury trial, in favor of a bench trial. 5-ER-1115-16.

Counsel based that advice on the fact that, *if* there had been significant impeachment evidence on Gerou, a jury would be the best option. 5-ER-1115-16, 1130-31. Significantly impeaching an expert's credibility before a jury is a strong trial tactic. 5-ER-1136-37. But because Gerou apparently agreed with the defense assessment of the forensics, there was no need to impeach him, and thus a bench trial would be best due to the technical issues and subject matter. 5-ER-1134-37.

Based on that fundamental misunderstanding of the government's position, Mr. Liddy waived his right to a jury. 5-ER-1134-37.

## E. The trial.

When the bench trial began, there was no hint of surprise. Because the government waived its opening statement, 4-ER-599, the defense remained unaware there was any disagreement about the state of the evidence. This was apparent in the defense's opening, which reiterated its core operating assumption: "Mr. Liddy never knew of the presence of the ten charged files, nine of which are on -- in unallocated space and one had a file hidden, erroneous file extension." 4-ER-601.

14

Even then, the government did not inform the defense that Gerou would disagree. Instead, it called its first witnesses to testify about the home search and recovering the digital media, as well as to enter Mr. Liddy's pre-*Miranda* statements into evidence. 4-ER-602-21.

The government then called Gerou. 4-ER-621. Initially, he testified as expected. He began addressing the ten charged files in the bill of particulars, referred to as government exhibits 9-11, 13, 15, and 17-21. 4-ER-633; 5-ER-940. He agreed the first file, exhibit 9 ("JTF Panama") had "a bad extension." 4-ER-639. So "if a user double clicked on jtfpanama.pdf that the file would not open" and the user would receive an error message. 4-ER-676. He further agreed there was *nothing* to suggest the file had ever been opened, viewed, or that Mr. Liddy had ever seen what it depicted. 4-ER-680.

As to the second file, exhibit 10, Gerou correctly noted it was deleted from the iOmega, but incorrectly claimed it could be accessed by opening the recycling bin. 4-ER-640-41. He failed to realize that the iOmega did not have an accessible recycling bin and that the file was in unallocated space and could not be accessed. 4-ER-809-11. (The government later admitted his error. 5-ER-886.) He also correctly conceded there was

15

*nothing* to suggest the file had ever been opened, viewed, or that Mr. Liddy had ever seen what it depicted. 4-ER-684.

As to the third file, exhibit 11, Gerou accurately reported it was in unallocated space on the Cruzer-16GB. 4-ER-642-44. He agreed the average user did not have the ability to access the file without specialized forensic software and experience. 4-ER-644-45. He did not know when the file was put on or deleted from the drive. 4-ER-690-91. And there was nothing to suggest the file had ever been opened, viewed, or that Mr. Liddy had ever seen what it depicted. 4-ER-691-92.

As to the fourth file, exhibit 13, it too was found in unallocated space on the Cruzer-16GB and thus inaccessible. 4-ER-656. The same was true of the fifth file, exhibit 15. 4-ER-657-58. Like the others, there was nothing to suggest the files had ever been opened, viewed, or that Mr. Liddy had ever seen what they depicted. 4-ER-691-92.

Gerou's testimony then moved on to files six through ten on the Cruzer-1GB. **This testimony is particularly important, because the district court ultimately convicted Mr. Liddy of possessing just the files on this particular drive**.

16

As to the sixth file, exhibit 17, Gerou testified on direct examination that this was an "actively used file so it's allocated" and a "user could go to the new folder on this particular thumb drive and click it and open it." 4-ER-658-59. This was not true, as the Government eventually conceded. 5-ER-858-60.

As to the seventh, eighth, ninth and tenth file, exhibits 18 through 21, Gerou testified that these files were also in "allocated" space and thus accessible. 4-ER-659-64. This too was untrue, as the government would later admit. 5-ER-858-60.

Gerou, however, was right about one thing: There was *nothing* to suggest Mr. Liddy had ever opened, viewed, or seen what any of these files depicted. 4-ER-700-01. He further agreed the ten subject files could have been deleted without Mr. Liddy having opened them. 4-ER-702.

Following Gerou's testimony, the government rested. 4-ER-751. The court then denied Mr. Liddy's motion for a judgment of acquittal. 4-ER-751.

At that point, defense counsel explained their astonishment at Gerou's claim that several files were accessible: "the question before the Court is for a number of these files, were they in allocated or in

17

unallocated space. **For the very first time we heard that [] Gerou thinks that some of those files were in allocated space. The very first time. We have all been operating under the assumption that other than the one file, everybody understood completely that these were in unallocated space**." 4-ER-760-61.[6] "[T]he defense understood from their [the government's] prior reports and every conversation we've had that they [the government] understood that to be structured *unallocated* space, and that was fine with us because we were all operating on that same assumption." 4-ER-763.

However, as a result of Gerou's unexpected (and undisclosed) testimony, the defense explained it was now forced to call its expert, Josiah Roloff, "for a limited purpose, rebutting what we believe are objectively wrong statements from [] Gerou." 4-ER-756.

The government then moved to preclude the defense expert, arguing the defense committed a discovery violation by not providing a defense expert report. 4-ER-756-57; 5-ER-1019-20. The defense responded that its expert did not prepare a report, as he was never

---

[6] Unless otherwise noted, all emphases in this brief are added, all internal citations and quotation marks are omitted.

expected to testify in the first place. 4-ER-757-60. "We had all understood from jump that this was in unallocated space. The first time all of us -- **you could have heard our jaws hitting the table**. We just assumed everyone had to know this was unallocated space because it is." 4-ER-768.

Ultimately, the district court allowed the defense to call Roloff. 4-ER-773. He testified that Gerou was wrong in asserting that files 6-10 (exhibits 17-21) were in allocated space. 4-ER-779-80. They were actually all deleted and in unallocated space, inaccessible to the user without special forensic software and expertise. 4-ER-780-86, 792-806.[7]

In response to questions from the court, he further explained the files were saved to the Cruzer-1GB thumb drive on May 24, June 14, and 17 of 2017, but there was no evidence they were ever opened or viewed. 4-ER-786, 794. Nor was there any evidence as to when they were deleted. 4-ER-786. Additionally, "you could have a thumb drive plugged into a computer and bypass the computer where you're getting that file

---

[7] Roloff also explained that Gerou was wrong when he testified that file 2, exhibit 10, was in the recycling bin on the iOmega. 4-ER-808. It too was a deleted file in unallocated space. 4-ER-808.

from and send it directly to a thumb drive, absolutely." 4-ER-788. Thus, crucially, the files could have been saved directly to, and deleted from, the Cruzer-1GB **without ever having been opened or viewed, and without first residing on the computer's internal hard drive**. 4-ER-787.

The district court further inquired on this point:

THE COURT: Is there anything in any of these forensic tools that can tell you affirmatively whether a file was opened and viewed or not?

THE WITNESS: Yes.

THE COURT: Is there anything present here that shows that they were not viewed?

THE WITNESS: So the "not" part, no. There are artifacts that can be generated if a file has been double clicked, a file is going to open in certain applications, those things can be present. **They are not in this case for these files**.

4-ER-816.

Following Roloff's direct examination, the defense called several character witnesses who testified to Mr. Liddy's law-abidingness and truthfulness. 4-ER-838-52. Trial then broke for the evening.

20

The next morning, the defense informed the court, "this morning we received an email from the government confirming [] Roloff's testimony was correct" and Gerou was wrong. 5-ER-858. The government conceded none of the files were accessible to Mr. Liddy. 5-ER-858.

Roloff was then recalled and reiterated his testimony that a user "could save a file . . . to a thumb drive without ever seeing the contents[.]" 5-ER-881. Further, "if a file was to have been viewed," the computer's operating system would create a record (or "artifact") of that event, although it might not be recoverable due to the passage of time. 5-ER-881-82. No evidence of such artifacts existed as to any of the subject files. 5-ER-881-82.

The defense then rested and renewed its motion for a judgment of acquittal, which the court denied. 5-ER-894.

After calling a final rebuttal witness (whose testimony is not relevant to Mr. Liddy's arguments on appeal), the government again rested. 5-ER-901-04. The district court then denied the defense's final motion for a judgment of acquittal. 5-ER-904.

**F.    The conviction and new trial motion.**

Following closing arguments, the court rendered its decision from the bench:

> [T]he Court is going to particularly focus on Exhibits 17 **through 21** because for those images, I have undisputed evidence as to the dates they were created on the thumb drives, that they were created, saved to those drives on May 24, June 14, and June 17, and the Court finds that to be within a reasonable date near the alleged date of the indictment.
>
> So those images were affirmatively saved to those drives on a date that comes within the scope. They were, therefore, in the possession of Mr. Liddy because I find the thumb drives to have been -- thumb drive, **the 1 gigabyte thumb drive**, to have been his drive saved on those dates.
>
> So then the question becomes whether he knew what those images were when they were saved. And here's where, of course, we have to get into using both his statement that has been received into evidence and circumstantial evidence. The Court finds that the government has established that he knew what he was saving.
>
> ***
>
> If this was a case where the only images were on his desktop [hard drive] where he was engaging in these chat

room conversations and they were solely on deleted space there, then I think the government may have fallen short of their burden to show that he had, in fact, done anything other than deleted those images in these conversations; opened them and went oh, no, I don't want that, and deleted it.

**But they had to be moved from that desktop [hard drive] or some other source to these thumb drives to be saved** and then subsequently deleted, but that does not, from the Court's position, meet the definition of something that was promptly deleted. If it was promptly deleted, it would never have gotten to the thumb drive. **It would have been deleted from the hard disk drive of his desktop and would never have been transferred over.** There's a statement from Mr. Liddy, I save, I delete, I save, I delete. And there's really nothing here to suggest that he did not know that he had come into possession of these pictures, had saved them, and deleted them.

\*\*\*

Consequently the Court does find Mr. Liddy guilty of this offense[.]

5-ER-932-36.

Thereafter, the court denied Mr. Liddy's new trial motion and sentenced him to probation. 1-ER-50-57; 6-ER-1340-48. As noted, he is now required to register as a sex offender for life. 6-ER-1257-58. The

stigma of the conviction is debilitating. 6-ER-1257-58. This Court should wipe away that stain and vacate his conviction.

## SUMMARY OF ARGUMENT

The lynchpin of the district court's finding that Mr. Liddy knew the contents of the disputed files was its inference that he first downloaded them to his computer hard drive and then "moved" or "transferred them over" to the thumb drive, presumably because he viewed them on his computer and wanted to save them. But there was no evidence to support this theory.

Neither expert testified the files were ever saved to the computer and then "transferred over" to the thumb drive. Indeed, both contradicted any such inference by testifying that the files could be saved directly to the thumb drive, without being opened or viewed.

Thus, the district court's finding that Mr. Liddy first downloaded the files to his computer and then transferred them to the thumb drive had no evidentiary support, and the government provided no other evidence that Mr. Liddy ever viewed these files before deleting them. As such, it failed to prove Mr. Liddy had knowledge of the contraband nature

of the files. And because that is an element of the offense, the conviction cannot stand.

Reversal is also warranted because the district court erred in denying Mr. Liddy's new trial motion. Mr. Liddy's jury waiver was based on a fundamental misunderstanding of the agreed-upon evidence and the relative benefits of a bench trial. As such, his waiver was unintelligently made, and an unintelligent waiver is structural error.

Finally, the district court erred in denying Mr. Liddy's motions to suppress.

First, the warrantless search of Mr. Liddy's subscriber information violated the Fourth Amendment, the third-party doctrine does not apply, and neither does the good faith exception.

Second, as to his statements, Mr. Liddy was cornered in his own home by visibly armed agents accusing him of possessing child pornography, while his wife slept upstairs. A reasonable person in Mr. Liddy's position would not have felt free to leave. The interaction, therefore, was custodial and *Miranda* warnings were required. Because they were not given, his statements should have been suppressed.

25

For each of these reasons, this Court should vacate Mr. Liddy's conviction.

## ARGUMENT

### I.
### Standards of review.

The Court reviews de novo the denial of a motion for a judgment of acquittal. *See United States v. Hernandez-Orellana*, 539 F.3d 994, 1002 (9th Cir. 2008). The inquiry is "whether, viewing the evidence in the light most favorable to the government, any reasonable [trier of fact] could have found the essential elements of the crime beyond a reasonable doubt." *Id.*

The Court "review[s] the adequacy of a jury-trial waiver de novo." *United States v. Shorty*, 741 F.3d 961, 965 (9th Cir. 2013); *United States v. Laney*, 881 F.3d 1100, 1106 (9th Cir. 2018). It reviews the denial of a new trial motion for abuse of discretion. *See United States v. Murillo*, 288 F.3d 1126, 1140 (9th Cir. 2002).

The Court reviews "a district court's denial of a motion to suppress evidence de novo and [] the district court's factual findings for clear error." *United States v. Job*, 871 F.3d 852, 859 (9th Cir. 2017). The Court

also reviews "whether a defendant is constitutionally entitled to *Miranda* warnings de novo." *United States v. Craighead*, 539 F.3d 1073, 1082 (9th Cir. 2008).

## II.
## The evidence was insufficient to support the conviction.

The district court convicted Mr. Liddy of knowingly possessing files 6-10 (exhibits 17-21) on the Cruzer-1GB thumb drive.[8] That was error. The court mistakenly constructed its own factual theory of knowledge unsupported by the evidence or the law.

### A.     The government failed to prove Mr. Liddy knew the subject files depicted child pornography.

To sustain a conviction under 18 U.S.C. § 2252(a)(4)(B), the government must prove both possession and knowledge beyond a reasonable doubt.  *See* Ninth Cir. Model Jury Instr. Crim. 8.185.  To prove knowledge, the government must show the defendant knew he or she possessed the subject images *and* that they depicted minors "engaged in sexually explicit conduct."  Model Jury Instr. Crim. 8.185.  In other words, the "knowledge" *mens rea* applies to both the act of possession *and*

---

[8] Mr. Liddy's argument applies to the specific files underlying the guilty verdict and to the other charged files.

the contraband nature of the content. *United States v. X-Citement Video*, 513 U.S. 64, 72-73 (1994).

Thus, in the context of the files charged here, the government was required to prove Mr. Liddy knew about files 6-10, had control over them, *and* knew they depicted child pornography. *See id.* To this end, it was not enough for the government to establish Mr. Liddy knowingly possessed the Cruzer-1GB drive or even the image files, it had to further prove beyond a reasonable doubt that he "*knew* the [files] in question contained an unlawful visual depiction." *United States v. Lacy*, 119 F.3d 742, 747 (9th Cir. 1997). It did not.

In the light most favorable to the government, the relevant facts were these:

- Files 6-10 were deleted, found in unallocated space that was inaccessible to Mr. Liddy. 4-ER-780-86, 792-806.

- There was no testimony or forensic evidence that Mr. Liddy ever opened these files, viewed the images, or knew what they depicted. 4-ER-700-01, 786-87, 794.

- There is often forensic evidence showing that a file *has* been opened. Here there was none. 4-ER-816.

- The files could have been deleted without ever having been opened. 4-ER-702, 787.

28

- The files could have been saved directly to the Cruzer-1GB, and then deleted, without first having been saved on Mr. Liddy's desktop hard drive. 4-ER-818-19 ("you could save a file directly to a thumb drive from all sorts of different sources, so the file may have been saved directly to the thumb drive versus say the desktop['s] [internal hard drive] and then moved to the thumb drive."). There was absolutely no evidence these files were first saved to the desktop's hard drive and then moved to the Cruzer-1GB. 4-ER-787-88.

- Unlike virtually every other federal child pornography prosecution,[9] the district court found that "[t]here is no search history that the government provided to show that he was looking for this material or sharing this material[.]" 6-ER-1340-41. Nor was there any evidence that Mr. Liddy collected child pornography – not a single accessible image was found. 3-ER-566.

Under these facts, Mr. Liddy was entitled to an acquittal. And this Court's decision in *Flyer*, 633 F.3d at 919, compels that conclusion.

## B.  This Court's *Flyer* opinion is dispositive.

The defendant in *Flyer* was convicted of "possession of child pornography on the unallocated space of a Gateway computer hard drive[.]" *Id.* at 913. On appeal, he successfully argued insufficient evidence of knowing possession. *See id.*

---

[9] As the government's search warrant application explained, individuals involved with child pornography "*almost always* possess and maintain [] 'hard copies' of child pornographic material . . . in the privacy and security of the home or secure online accounts." 2-ER-101. Not here.

In vacating his conviction, this Court explained: "The images . . . were all located in 'unallocated space' on the Gateway hard drive. Unallocated space is space on a hard drive that contains deleted data, usually emptied from the operating system's trash or recycle bin folder, that cannot be seen or accessed by the user without the use of forensic software. Such space is available to be written over to store new information. Even if retrieved, all that can be known about a file in unallocated space (in addition to its contents) is that it once existed on the computer's hard drive." *Id.* at 918.

The Court continued: "Our precedent . . . suggests that a user must have knowledge of and *access to* the files to exercise dominion and control over them." *Id.* at 919. The Court concluded the government had not met its burden on this point because there was "no evidence that Flyer knew of the presence of the files on the unallocated space of his Gateway computer's hard drive" and "no evidence that Flyer had the forensic software required to see or access the files." *Id.*

The Court also rejected the government's argument "that evidence demonstrating that the files had at some point been deleted, resulting in

30

their placement in unallocated space, is sufficient to establish possession." *Id.* at 920.

This reasoning is outcome determinative here. As in *Flyer*, the fact that the subject images had existed in accessible space before being deleted is not sufficient to establish knowing possession. Instead, the government was required to prove Mr. Liddy possessed them *knowing their nature*. This it did not do. Thus, as in *Flyer*, the conviction fails.[10]

---

[10] Further support for this conclusion comes from:

- *United States v. Kuchinski*, 469 F.3d 853, 862-63 (9th Cir. 2006) ("Where a defendant lacks knowledge about the [] files, and concomitantly lacks access to and control over those files, it is not proper to charge him with possession and control of the child pornography images located in those files").

- *United States v. Moreland*, 665 F.3d 137, 152 (5th Cir. 2011) ("the digital images . . . were in the computers' unallocated [] spaces . . . and there was no circumstantial indicium that established that [the defendant] knew of the images or had the ability to access them. Thus, we hold that the evidence supporting [the] conviction of knowing possession of child pornography is constitutionally insufficient.").

- *United States v. Dobbs*, 629 F.3d 1199, 1204 (10th Cir. 2011) (as to the two images at issue, there was no evidence presented to the jury that Mr. Dobbs even saw them, much less had the ability to exercise control over them . . . As such, although there is no question that a rational jury could have found that Mr. Dobbs 'received' the two images, we conclude that it could not have found that Mr. Dobbs did so knowingly.").

C. **The district court's flawed analysis.**

The district court, however, incorrectly assumed: "[files 6-10] had to be moved from that desktop['s] [internal hard drive] or some other source to these thumb drives to be saved and then subsequently deleted . . . . If it was promptly deleted, it would never have gotten to the thumb drive. *It would have been deleted from the hard disk drive of his desktop and would never have been transferred over.*" 5-ER-935. This was not a peripheral observation; it was the lynchpin of the conviction. In the court's own words: "They had to be moved there . . . that was *fundamental* to the Court's finding that he had viewed them and saved them, and ultimately deleted them[.]" 6-ER-1341.

In other words, the court convicted Mr. Liddy on a theory of its own invention – i.e., that he must have first downloaded the files to his desktop's hard drive, viewed them there, decided they were worth saving, and then transferred the files to his thumb drive before ultimately deleting them. If there were evidence of these various steps, the district court would almost certainly have been right – downloading, viewing, and then transferring to a new device before deleting is likely enough to show knowing possession. But there was no such evidence.

32

While the trier of fact is entitled to draw reasonable inferences based on the trial record, it cannot invent those facts. Nor can it stack inference upon inference to reach conclusions unsupported by the actual evidence. *See United States v. Lopez*, 484 F.3d 1186, 1201 (9th Cir. 2007) ("mere suspicion or speculation does not rise to the level of sufficient evidence."); *United States v. Weber*, 923 F.2d 1338, 1345 (9th Cir. 1990) ("with each succeeding inference, the last reached is less and less likely to be true."). Yet that is exactly what happened here.

1. The district court's "transfer over" theory was unsupported by the evidence.

Contrary to the district court's speculation, the expert testimony established Mr. Liddy could have saved the files directly to the Cruzer-1GB. 5-ER-881-82. Indeed, there was no evidence files 6-10 had *ever* been on the desktop's hard drive to begin with or had been transferred to the Cruzer-1GB from a different device. 4-ER-788; 5-ER-882.

Transferring a file from one drive to another involves several steps, each of which would generate artifacts – e.g., writing the file to the computer's hard drive, copying it to the thumb drive, and deleting it from the hard drive. If the district court's theory were correct, there would

33

almost certainly have been *some* forensic evidence of those artifacts, even in unallocated space. 5-ER-881-82. Yet there was none.[11]

The evidence did, however, confirm what we all know from experience: files can be deleted without first being opened. 4-ER-683-84, 788, 793-94, 806.

> Q. Can you say whether that file was opened before it was deleted?
> A. No.
> Q. Can you say whether that file was ever viewed before it was deleted?
> A. No.

4-ER-808-09.

And if the files had been opened, again there should have been forensic evidence of that fact. 5-ER-881-82; *see also United States v. Hardick*, 766 F.3d 1051, 1054 n.2 (9th Cir. 2014) (noting expert testimony that computers retain a record of files that have been opened and viewed); *United States v. Romm*, 455 F.3d 990, 995 (9th Cir. 2006) (by contrast,

---

[11] There was also no evidence Mr. Liddy had a pattern of saving contraband files to his desktop's hard drive before moving a subset to his thumb drive. Had such evidence existed, it would no doubt have been recovered and presented at trial. It was not.

the expert found forensic evidence that Romm had previously seen deleted files). Again, there was not. Thus, the district court's "transfer over" theory collapses for want of support. And with it, this case becomes identical in every material respect to *Flyer*. Mr. Liddy's conviction must be vacated.

2. <u>The district court's misplaced reliance on Mr. Liddy's pre-*Miranda* statements</u>.

Nor do Mr. Liddy's statements fill the evidentiary gap. The district court primarily relied on "a statement from Mr. Liddy, ['I]I save, I delete, I save, I delete.[']." 5-ER-935-36. The court's reliance was misplaced.

Read in context, Mr. Liddy's statement was not evidence he saw the specific files at issue here, or *knowingly* possessed any child pornography. Rather, Mr. Liddy's statement confirms that, whenever he saw such contraband, he deleted it.[12] On this point, he was clear: "if I click something that looked like a young child, I would delete it." 5-ER-969.

---

[12] Mr. Liddy told the agents he saw child pornography at some point, but he then deleted it. 5-ER-960-61, 965-66. In other words, he did not possess it once he knew what it depicted.

But, even taken out of context, "I save, I delete, I save, I delete" provides no support for the district court's "transfer over" theory—none. To the contrary, as explained, given the tickertape-style of the chats, he often had no time to inspect files in real time, so he would save them for possible later inspection (which might or might not happen) before deleting. However, there was *no* evidence he only saved files that he had first inspected or that he knowingly saved child pornography to the Cruzer-1GB thumb drive.

Thus, while the district court's theory was not necessarily impossible, it was highly speculative and totally unsupported. It was not proven beyond a reasonable doubt, and certainly not to the exclusion of other plausible explanations – e.g., that Mr. Liddy saved the files directly to the Cruzer-1GB and then deleted them either without opening them or as soon as he recognized they were contraband.

And when, as here, "[e]ach scenario is plausible, and though one might debate their relative merits, to settle on one beyond reasonable doubt would require guesswork," which is inconsistent with "proof beyond a reasonable doubt." *United States v. Pothier*, 919 F.3d 143, 147 (1st. Cir. 2019); *see also United States v. Lowe*, 795 F.3d 519, 523-24 (6th

36

Cir. 2015) ("Although a juror might infer from visits to appliance-repair and banking websites that an adult primarily used the computer, she could only speculate about whether the adult was James or Stacy Lowe.").[13]

Accordingly, the analysis ends where it began. Just as in *Flyer*, the files were in unallocated space. And because there was no evidence Mr. Liddy ever knew what they depicted, the evidence was insufficient. His conviction cannot stand. *See In re Winship*, 397 U.S. 358, 363-64 (1970) ("a society that values the good name and freedom of every individual should not condemn a man for commission of a crime when there is reasonable doubt about his guilt.").

## III.
## The district court erred in denying Mr. Liddy's motion for a new trial.

The district court also erred in denying Mr. Liddy's new trial motion.

---

[13] The California Model Jury Instructions make the same point: "If you can draw two or more reasonable conclusions from the circumstantial evidence, and one of those reasonable conclusions points to innocence and another to guilt, you must accept the one that points to innocence." CALCRIM 224.

## A.   Relevant facts.

To recap, at all times before waiving jury, Mr. Liddy believed, and was repeatedly advised, that the parties agreed the relevant files were all deleted and in unallocated space.  This belief appeared well-founded based on the parties' communications.

> 1.   <u>The defense repeatedly explained what it believed was the agreed-upon state of the evidence.</u>

Beginning in mid-2018, even before the bill of particulars, defense counsel advised the government that its experts concluded the files were not accessible: "I have discussed the San Disk Cruzer . . . and *neither [expert] believes that those images are accessible*."  5-ER-1060.  The government never responded that it disagreed.

Thereafter, in communications and court filings, defense counsel consistently reiterated that the files were "in unallocated space, inaccessible without sophisticated forensic software."  5-ER-996.  The government never challenged this proposition.

38

Nor did it do so in its expert notice for Gerou, which came months *before* the jury waiver. 3-ER-527-28.[14] The notice failed to provide "a written summary of any [expert] testimony that the government intends to use," as required by Federal Rule of Criminal Procedure 16(a)(1)(G). Instead, it merely contained a generic list of categories about which Gerou might testify. 3-ER-527-28. Nowhere did it state Gerou believed any of the files were accessible.[15] This in turn cemented the defense's belief that the government had the same (accurate) understanding of the forensics.[16]

To that end, pre-trial, the defense told the district court: "**the objective fact [is] that nine of the files in the bill of particulars were located in deleted/inaccessible space** . . . and the remaining file had a

---

[14] On May 10, 2019, the government informed the defense that Gerou would testify as its forensic expert. 3-ER-527. Mr. Liddy signed the jury waiver on November 13, 2019. 3-ER-461.

[15] Gerou's forensic examination – provided in discovery *before* the expert notice – also did not state any of the subject files were in allocated space. 5-ER-1030-38.

[16] For this reason, the defense did not move for further expert notice; there appeared no need for further clarity.

corrupt file extension and thus could not be opened/accessed by normal methods (e.g., double-clicking)." 3-ER-521-22.

Finally, during a pre-trial hearing, defense counsel repeated: "**we think we're going to be able to get everything from their expert.**" 3-ER-559. The defense further explained its belief that the parties agreed on the evidence: "**I think they know exactly what the forensics are**. We think we know what the forensics are. **And those are going to be objective facts that will hopefully be presented to the Court through their expert.**" 3-ER-559. Yet again, the government never expressed disagreement.

2. <u>Mr. Liddy waived his right to a jury based on material misinformation about the prosecution's evidence</u>.

Based on this understanding, and the government's failure to provide the required summary of Gerou's testimony, the defense advised Mr. Liddy to waive jury.

As counsel explained: "We based Mr. Liddy's trial strategy, including our joint advice to Mr. Liddy to waive jury, on the understanding that the government agreed that the evidence established that [the relevant] files . . . were inaccessible, located in unallocated space. We also told Mr. Liddy that Gerou would testify all

40

the files in the bill of particulars were not accessible because they were in unallocated space (save the one with the corrupt filed extension). Thus, we advised him there would likely be no need to significantly impeach the government's expert. Rather, Gerou would likely be helpful to the defense." 5-ER-1115-16, 1135.

"We further explained our view that, when there are no major factual disputes or clear errors in the investigation, there was no material benefit to a jury, especially given the nature of the case . . . . [L]argely because we did not believe we had strong impeachment evidence on Gerou that could resonate with jurors – or a need to impeach him – we ultimately advised Mr. Liddy a bench trial was the best course." 5-ER-1116.

"Had we known before Mr. Liddy waived jury that [] Gerou had concluded that multiple files in the bill of particulars were in accessible space we would have weighed the jury trial vs. waiver of jury choice and our recommendation very differently and most likely would have advised Mr. Liddy against a jury waiver[.]" 5-ER-1135.

This was because "effective impeachment of a critical government witness can make a jury discount not only that witness's testimony but

much of the government's case. Juries will acquit – or hang – in many circumstances where judges will not, and particularly where the government's case can be shown to be unreliable. In short, when jurors believe a critical government witness, like an expert in a forensic evidence case, is less than reliable, this alone can be the basis for reasonable doubt." 5-ER-1136-37; *Kyles v. Whitley*, 514 U.S. 419, 446 n. 15 (1995) ("indications of conscientious police work will enhance probative force and slovenly work will diminish it"). And all it takes is "one juror[.]" *United States v. Kohring*, 637 F.3d 895, 905-06 (9th Cir. 2011).

Mr. Liddy, however, did not get the opportunity to evaluate these considerations before waiving his constitutional right to a jury. Instead, that waiver resulted from material misinformation as to the state of the evidence. On this basis, Mr. Liddy moved for a new trial, arguing his waiver was not intelligently made. 5-ER-1110. The court denied the motion. 6-ER-1230. Although it acknowledged there had been a fundamental misunderstanding prior to the waiver, the court determined it was irrelevant because Mr. Liddy understood the differences between a trial by judge and one by jury.

42

This was the wrong inquiry; the court erroneously conflated a *knowing* waiver with an *intelligent* one.

## B.   Mr. Liddy's invalid jury waiver.

### 1.   <u>Relevant legal principles</u>.

Under Federal Rule of Criminal Procedure 33: "Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  In the context of an invalid jury waiver, however, there is no discretion and no prejudice requirement; a new trial is required because an invalid jury waiver is structural error.  *See Laney*, 881 F.3d at 1108.

Moreover, courts must "indulge every reasonable presumption against waiver[.]"  *Id.* at 1107.  "[B]efore any [jury] waiver can become effective . . . the court must [have] . . . the express and *intelligent* consent of the defendant."  *Patton v. United States*, 281 U.S. 276, 312 (1930).  Determining "[w]hether or not there is an intelligent, competent, self-protecting waiver of jury trial by an accused *must depend upon the unique circumstances of each case*."  *Adams v. United States ex rel. McCann*, 317 U.S. 269, 278 (1942).

43

In other words, to be valid, the waiver "'must be [a] knowing, intelligent act[] done with sufficient awareness *of the relevant circumstances* and likely consequences.'" *United States ex. rel. Williams v. De Robertis*, 715 F.2d 1174, 1178-79 (7th Cir. 1983) (quoting *Brady v. United States*, 397 U.S. 742, 748 (1970)). A waiver "is unintelligent, therefore, if a . . . defendant for any other reason lacks sufficient awareness of the relevant circumstances and likely consequences." *United States v. Hernandez*, 203 F.3d 614, 619 n.7 (9th Cir. 2000).

> 2.   <u>Mr. Liddy's jury waiver was not intelligently made</u>.

Here, under the "the unique circumstances of [this] case," Mr. Liddy's waiver was not intelligently made. *Adams*, 317 U.S. at 278. Although he understood the right he was foregoing, he did not have "sufficient awareness of the relevant circumstances" underlying that choice. *Williams*, 715 F.2d at 1178-79. The foundation for the waiver was the defense's belief, fostered by the government, that the parties agreed on the forensics. But that foundation was non-existent. And with it, the validity of the waiver crumbles.

This should not be a controversial proposition. Suppose, for example, a friend throws you the keys to what she says is her new sports

44

car. She tells you to take it for a spin, but fails to mention it is stolen. Lacking that crucial information, you agree. Halfway through your drive, sirens sound and the truth comes out. In that scenario, you knowingly decided to drive the car – you knew you were taking the keys, starting the ignition, etc. – but that decision was not fully informed, and therefore not intelligent. You "lack[ed] sufficient awareness of the relevant circumstances and likely consequences[.]" *Hernandez*, 203 F.3d at 619 n.7. The same is true for Mr. Liddy.

Nor does it matter "that [he] may have made a 'tactical choice' to waive a jury[,]" because this "tells [] nothing about whether he understood what he would be giving up by making such a choice." *Shorty*, 741 F.3d at 969. Accordingly, "indulg[ing] every reasonable presumption against waiver," Mr. Liddy's waiver cannot be deemed intelligent. *Laney*, 881 F.3d at 1107. [17]

---

[17] Additional support for Mr. Liddy's position comes from this Court's analogous plea-withdrawal jurisprudence. Similar to the "interest of justice" standard in Rule 33, under Rule 11(d)(2)(B), a defendant may withdraw a guilty plea by showing "a fair and just reason." And as the Court explained in *United States v. Davis*, 428 F.3d 802, 807 (9th Cir. 2005), "a defense counsel's erroneous advice may warrant withdrawing a plea even if the defendant does not prove that he would not have pleaded guilty but for the erroneous advice."

The government may respond by pointing out that it eventually admitted its mistake and withdrew Gerou's testimony. But this is irrelevant. The focus is on what Mr. Liddy misunderstood *at the time of the waiver*, not on how the evidence eventually came out. *See Hernandez*, 203 F.3d at 619 n.7. Indeed, regardless of what happened later, the fact remains that the waiver was not intelligently made when it was entered. And because an invalid jury waiver is structural error, prejudice is irrelevant, and a new trial is required. *See Laney*, 881 F.3d at 1108.

## IV.
## The district court erred in denying Mr. Liddy's suppression motions.

Apart from the trial issues, the Court should vacate Mr. Liddy's conviction because the district court erred in denying his motions to suppress: (a) the fruits of the warrantless subscriber-information search, and (b) his pre-*Miranda* statements.

### A. The government's warrantless search of Mr. Liddy's subscriber information violated the Fourth Amendment.

The government used an administrative subpoena to obtain Mr. Liddy's Internet subscriber information. This "was a search within the meaning of the Fourth Amendment." *Carpenter v. United States*,

46

138 S. Ct. 2206, 2220 (2018). Thus, a warrant was required. *See id.* Because the government acted without one, the search was unconstitutional, and suppression is the remedy. *See United States v. Cervantes*, 703 F.3d 1135, 1143 (9th Cir. 2012).

1.   Relevant facts.

After receiving NCMEC reports implicating IP address 76.88.66.25, the government served administrative subpoenas on Time Warner Cable seeking subscriber information for the customer(s) connected to that IP address.

With no judicial oversight, the subpoenas "commanded and required" Time Warner Cable to disclose a broad list of personal information:

- "Customer or subscriber name, address of service, and billing address;"

- "Length of service (including start date and end date);"

- "Local and long distance telephone connection records (examples include: incoming and outgoing calls, push-to-talk, and SMS/MMS connection records);"

- "Means and source of payment (including any credit card or bank account number);"

47

- "Records of session times and duration for Internet connectivity; Telephone or **Instrument number (including IMEI, IMSI, UFMI, and ESN)** and/or other customer/subscriber number(s) used to identify customer/subscriber, including any temporarily assigned network address (including Internet Protocol addresses);"[18] and,

- "Types of service used (e.g. push-to-talk, text, three-way calling, email services, cloud computing, gaming services, etc.)."

2-ER-179.  None of this information was public.

In response, Time Warner provided the subscriber name, the home address for the Liddys, the dates of service, several personal email addresses, and three personal phone numbers.  2-ER-186, 189.  The government then used this information to obtain search warrants for Mr. Liddy's home.  2-ER-136.

Mr. Liddy moved to suppress.[19]  He argued that, under *Carpenter*,

---

[18] Instrument numbers are unique identifiers of a particular device equivalent to a serial number.  Specifically, IMEI is the International Mobile Equipment Identity, a unique number used to identify a particular mobile device.  IMSI is the International Mobile Subscriber Identity, a unique number used to identify a mobile subscriber.  UFMI is the Universal Fleet Member Identifier, a unique number assigned to a telecommunications subscriber.  ESN is the Electronic Serial Number, a unique number assigned to a specific mobile phone.

[19] Mr. Liddy's declaration established his standing as a joint-account holder, resident, and the person actually paying for the Internet service. 2-ER-192-93.

48

the subscriber data was protected by the Fourth Amendment. 2-ER-164.

The district court denied the motion, concluding *Carpenter* was not

implicated, the subpoena was proper, and even if it was not, the good

faith exception would apply. 1-ER-6-7. For reasons that follow, the court

was mistaken.

2.    *Carpenter*.

In *Carpenter*, the Supreme Court considered whether the

government could use a court order under the Stored Communications

Act (SCA) – as opposed to a warrant – to obtain cell-site location

information (CSLI). *Carpenter*, 138 S. Ct. at 2215. The Court held it

could not. *Id.* at 2217, 2221-23.

In reaching this conclusion, the Court needed to reconcile "a

person's expectation of privacy in his physical location," *id.* at 2215, with

the "third-party doctrine," under which, "a person has no legitimate

expectation of privacy in information he voluntarily turns over to third

parties." *Id.* at 2216.

The solution was straightforward. The Court simply declined to

extend the third-party doctrine to CSLI records: "the fact that the

information is held by a third party does not by itself overcome the user's

49

claim to Fourth Amendment protection. Whether the Government employs its own surveillance technology . . . *or leverages the technology of a wireless carrier*, we hold that an individual maintains a legitimate expectation of privacy in the record of his physical movements as captured through CSLI." *Id.* at 2217.

The Court also rejected the government's "primary contention" that, under the third-party doctrine, "cell-site records are fair game because they are 'business records' created and maintained by the wireless carriers." *Id.* at 2219. This position, the Court concluded, "fail[ed] to contend with the seismic shifts in digital technology[.]" *Id.*

Moreover, "[c]ell phone location information is not truly 'shared' as one normally understands the term. In the first place, cell phones and the services they provide are 'such a pervasive and insistent part of daily life' that carrying one is indispensable to participation in modern society." *Id.* at 2220.

Given the Fourth Amendment implications, the Court "found that the acquisition of [] CSLI was a search," and "conclude[d] that the Government must generally obtain a warrant supported by probable cause before acquiring such records." *Id.* at 2221.

50

To this end, the Court further explained it had "*never held that the Government may subpoena third parties for records in which the suspect has a reasonable expectation of privacy.*" *Id.* "If the choice to proceed by subpoena provided a categorical limitation on Fourth Amendment protection, no type of record would ever be protected by the warrant requirement." *Id.* at 2222. That was untenable. Instead, a warrant is required "where the suspect has a legitimate privacy interest in records held by a third party." *Id.*

This reasoning is determinative here.

3.  <u>*Carpenter*'s analysis is controlling</u>.

    a.  *Mr. Liddy's Fourth Amendment interest in the subscriber information.*

At the outset, Mr. Liddy acknowledges there are obvious differences between the CSLI at issue in *Carpenter* and the subscriber information here. But as discussed below, for present purposes, these are distinctions without material difference.

Among many other safeguards, "[t]he Fourth Amendment protects us against unreasonable searches or seizures in our persons, houses, papers, and effects." *Craighead*, 539 F.3d at 1076. As *Carpenter*

reaffirmed, these protections are triggered in two circumstances. *See* 138 S. Ct. at 2213.

First, a "search" occurs when a government agent infringes on an "expectation of privacy [] that society is prepared to consider reasonable[.]" *Id.*[20] Second, there is a "search" within the meaning of the Fourth Amendment when the government intrudes upon "'a constitutionally protected area'" – persons, houses, papers, or effects – to "'obtain[] information.'" *Id.* (quoting *United States v. Jones*, 565 U.S. 400, 407 (2012)). In other words, the government violates the Fourth Amendment when it trespasses – physically or digitally – on personal property. *See id.*[21]

Here, the government's subpoena infringed both protected interests – privacy and property.

---

[20] The reasonable expectation of privacy test is often referred to as the *Katz* test. *See Katz v. United States*, 389 U.S. 347 (1967).

[21] This original Fourth Amendment understanding is often referred to as the property or trespassory theory. *See Jones,* 565 U.S. at 409 (the "reasonable-expectation-of-privacy test has been added to, not substituted for, the common-law trespassory test.").

Like the defendant in *Carpenter*, Mr. Liddy and his wife had a reasonable expectation of privacy in the subpoenaed data. That information went far beyond the IP and physical address to include, as to every inhabitant of the home, the instrument numbers of communication devices, payment records, personal telephone numbers, local and long-distance telephone connection records, times and duration of internet access sessions, the types of internet services used and email addresses.[22]

Without doubt, this was private information protected by the Fourth Amendment. It "could not otherwise have been obtained without physical intrusion into a constitutionally protected area" – i.e., entering Mr. Liddy's home to physically examine his devices and monitor his usage. *Kyllo v. United States*, 533 U.S. 27, 34 (2001). And in the home, "[t]he Fourth Amendment's protection . . . has never been tied to measurement of the quality or quantity of information obtained . . . . In the home, our cases show, *all* details are intimate details, because the

---

[22] This distinguishes Mr. Liddy's case from those where the government uses a subpoena solely to obtain the residential address and/or the subscriber's name associated with a particular IP address.

entire area is held safe from prying government eyes." *Id.* at 37 (emphasis in original).

As such, the expectation of privacy – and its violation – are manifest. *See id.* at 34-37; *see also Arizona v. Hicks*, 480 U.S. 321, 325 (1987) (merely moving a record player a few inches to reveal the serial number "produce[s] a new invasion of [] privacy" because it "expose[s] to view concealed portions of . . . its contents.").

Independently, the Liddys also had a distinct *property* right in their data – *their* digital papers and effects. As Justice Gorsuch has explained, "the fact that a third party has access to or possession of your papers and effects does not necessarily eliminate your interest in them." *Carpenter*, 138 S. Ct. at 2268 (Gorsuch, J., dissenting). "Just because you entrust your data . . . to a third party may not mean you lose any Fourth Amendment interest in its contents." *Id.* at 2269.

Applying this principle here, the subpoena acted as a digital trespass, allowing the government to gain access to the Liddys' property without a warrant. *Jones*, 565 U.S. at 419 n.2 ("At common law, a suit for trespass to chattels could be maintained if there was a violation of the *dignitary interest* in the inviolability of chattels") (Alito, J.,

54

concurring).[23]   Indeed, the intrusion here was in many ways more egregious than in *Carpenter*.  There, the location information obtained by the government involved activities conducted by the defendant in public, where he could be observed by numerous third parties.  The information sought in this case would divulge facts and events occurring *within the home*.  And as this Court has recognized, "[t]he home occupies a special place in the pantheon of constitutional rights." *Craighead*, 539 F.3d at 1077.

Then, too, the subpoena in *Carpenter* was subject to judicial supervision, having been issued "[u]pon approval by a neutral magistrate, and based on the Government's duty to show reasonable necessity," 138 S. Ct. at 2224 (Kennedy, J., dissenting), whereas the administrative subpoena in this case was subject to *no* judicial supervision and no requirement that the government show "reasonable necessity" or even that "that the records sought are relevant and material to an ongoing criminal investigation." *Id.* at 2212 (majority

---

[23] Mr. Liddy acknowledges the government had statutory authority to issue the subpoenas at issue. *See* 18 U.S.C. § 2703(c)(2).  But as in *Carpenter*, the statute must yield to the Fourth Amendment. *See* 138 S. Ct. at 2221.

opinion). Prosecutors simply wrote their own ticket without having to justify the necessity or breadth of the search to anyone.[24]

Nor does it matter that the government may have had probable cause to obtain some of the information it requested in the subpoena. Probable cause alone is not sufficient to obtain evidence protected by the Fourth Amendment. "It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586 (1980). Absent an exception, such as exigency or plain view, none of which apply here, the "answer to the question of what police must do before [obtaining subscriber data] is accordingly simple — get a warrant." *Riley v. California*, 573 U.S. 373, 403 (2014).

b. *The third-party doctrine cannot justify the warrantless search.*

The government, no doubt, will respond with the third-party doctrine. But as in *Carpenter*, it does not alter the Fourth Amendment

---

[24] Even if the required showing is not very onerous, the need to justify the necessity and scope of the search to a judicial officer itself serves as a constraint on government overreach. Self-justification too often means no justification.

analysis. *Carpenter* specifically held that the doctrine does not apply to *all* information shared with, or generated by, a third party: "[a] person does not surrender all Fourth Amendment protection by venturing into the public sphere." 138 S. Ct. at 2217. Rather, "what [one] seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected." *Id.* Even more so where the information is *not* "accessible to the public" but maintained in the most private place in the world – one's own home. *Id.* "[A]ny other conclusion would leave homeowners 'at the mercy of advancing technology' . . . ." *Id.* at 2214 (quoting *Kyllo,* 533 U.S. at 35).

Indeed, in ruling for individual privacy in the face of technological innovations, *Carpenter* became the third piece of an unmistakable trifecta that includes *Riley* and *Kyllo.* These cases collectively stand for the proposition that "Court[s] [are] obligated—as [s]ubtler and more far-reaching means of invading privacy have become available to the Government—to ensure that the progress of science does not erode Fourth Amendment protections." *Id.* at 2223.

This warning is particularly apt here. The information "commanded and required" by the government's subpoena formed a

57

chronicle of private communication activity conducted from and within the home. Knowing a household's local and long distance telephone records, means and source of payment (including any credit card or bank account number), records of session times and duration for Internet connectivity, telephone or instrument number and/or other customer/subscriber number(s) and types of service used (e.g. push-to-talk, text, three-way calling, email services, cloud computing, gaming services, etc.), is every bit as intrusive—arguably *more* intrusive—than tracking a single individual's location while in public.

Not only does such data provide far more detailed information as to personal life experiences, but it also necessarily covers *everyone* living in the home, including those as to whom there is *no* suspicion. If the government can obtain such information without making a showing of probable cause and obtaining a warrant for Mr. Liddy's home, it can constitutionally obtain such information, on its own and without judicial supervision, for any home with an Internet connection.

The government may respond that the breadth of the administrative subpoena is of no moment here, because Time Warner did not provide *all* the requested information. This is a red herring.

58

First, Time Warner did provide excess personal information – beyond the home's physical location – including email addresses and phone numbers (which were not material to this case). And it provided information as to the entire household, not just Mr. Liddy.

Second, more fundamentally, the Fourth Amendment infirmity lies in the government action – the broad subpoena – not in the data subsequently obtained. Thus, in *Riley*, the Supreme Court did not limit its ruling to cellphone searches that actually provide the prosecution with a significant amount of personal data; rather it held categorically that the government needs a warrant to search any cellphone. *See* 573 U.S. at 398-401.

What goes for cellphones must apply with no less force to homes. Here too, a warrant was required.

4. <u>Suppression is the appropriate remedy</u>.

The next question is remedy. The district court concluded the good faith exception would apply. But in reaching this conclusion, it focused on the later warrant for physical items in Mr. Liddy's home. This was the wrong inquiry. The Fourth Amendment infirmity was the *subpoena*

issued without judicial supervision and without establishing probable cause; that was the unconstitutional search.

The subsequent warrant for Mr. Liddy's home was a fruit of that violation, not itself the violation. Contrary to the district court's view, the good faith inquiry should not center on the warrant, but on the subpoena. *See United States v. Vasey*, 834 F.2d 782, 789-90 (9th Cir. 1987) (the good faith exception "does not protect from exclusion evidence seized during a search under a warrant if that warrant was based on evidence seized in an unconstitutional search."). To avoid suppression, therefore, the government had to establish the good faith exception applied to the subpoena. It did not and cannot.

As this Court has held, "conducting an illegal warrantless search and including evidence found in this search in an affidavit in support of a warrant is an activity that the exclusionary rule was meant to deter." *Id.* at 789.

Moreover, part of the rationale behind the good faith exception "is that since law enforcement officers . . . must often make hurried judgment[s], courts should not exclude probative evidence when officers make reasonable mistakes in obtaining a warrant." *Weber*, 923 F.2d at

60

1346. Thus, an important "factor in determining whether the warrant was obtained reasonably is the time pressure under which the Officer was operating[.]" *Id.* Here, there was *no* time pressure.

Suppression would also further the "prime purpose of the exclusionary rule[,] to deter future unlawful police conduct and thereby effectuate the guarantee of the Fourth Amendment against unreasonable searches and seizures." *Illinois v. Krull*, 480 U.S. 340, 347 (1987). Absent suppression, there is no incentive for agents to stop using broad administrative subpoenas to obtain information about what goes on inside a suspect's home.

Accordingly, because the government did not establish that the good faith exception applied to the *subpoena*, the district court erred in failing to suppress its fruits. They include not only the subscriber data but also the evidence gained during the home search. Indeed, without the subscriber information, the government would not have learned Mr. Liddy's identity or the physical address of his home. Plainly, therefore, the district court's error in denying suppression was not harmless – the unconstitutional search disclosed nearly all of the allegedly inculpatory evidence.

61

**B.    The district court erred in failing to suppress Mr. Liddy's pre-*Miranda* statements.**

Finally, the district court erred in denying Mr. Liddy's motion to suppress his pre-*Miranda* statements.

With armed agents occupying his house, making accusations about child pornography, and insisting on following him everywhere he went (including the bathroom), a reasonable person in Mr. Liddy's position would not have felt free to leave, especially because his wife was asleep in their bedroom with no idea what was happening.   As such, the encounter was custodial, and *Miranda* warnings were required at the outset.    Because they were not given, Mr. Liddy's statements were inadmissible.

1.    <u>Relevant facts</u>.

Early in the morning, three law enforcement agents arrived unexpectedly at Mr. Liddy's door.  3-ER-349-50, 352.  They wore flak jackets with their weapons visible.  3-ER-352.  Two of them had FBI gear, while the other appeared to be from local law enforcement.  3-ER-352.  Mr. Liddy was in his sleepwear: shorts and a t-shirt.  3-ER-352.

62

He allowed the agents to enter and explained his wife was sleeping upstairs. 3-ER-353; R1 at 2:05. The agents then questioned Mr. Liddy alone in his kitchen, quickly confronting him with allegations of child pornography. 3-ER-350-54; R1 at 3:45-19:20.

Mr. Liddy explained he engaged in Internet chats about sex. 3-ER-350-54; R1 at 5:30-25:25. In the course of chatting, he sometimes downloaded image files without first examining them. In those files, he had occasionally and inadvertently seen child pornography, but he was not interested in it and always deleted it. 3-ER-350-54; R1 at 12:00-33:20. When asked by one of the agents whether forensic examination would reveal "a ton" of *deleted* pictures of young kids, Mr. Liddy responded: "You would probably find some, but not a ton." 5-ER-363. (As noted, the district court relied on some of Mr. Liddy's statements in finding him guilty.)[25]

Before obtaining these admissions, however, the agents did not provide *Miranda* warnings and did not tell Mr. Liddy he was free to leave. Additionally, throughout this period of questioning, the agents

---

[25] While Mr. Liddy disputes that the statements are incriminatory, the fact remains that the district court relied on them.

63

never allowed Mr. Liddy to be alone or more than an arm's length from them.  3-ER-352-55.

As he described the experience, "I was terrified.  I felt like my life would be ruined and my wife would leave me.  Given the accusations of child pornography, I certainly did not feel free to leave . . . . Moreover, given that my wife was sleeping upstairs, I did not feel I could leave her alone in the house with the agents."  3-ER-353.  What spouse would?  Additionally, "the agents took control of my phone and iPad, so even if I left, I would have no way to communicate."  3-ER-354.

After approximately 40 minutes of questioning – and *after* obtaining all the statements cited by the district court in convicting him – an agent told Mr. Liddy he was free to leave, but in the same breath instructed him they would not "let" him get dressed until other agents cleared the house.  R1 at 36:00-37:00.  Shortly thereafter, the remainder of the government's search team arrived.  3-ER-349.  Approximately 15 agents from multiple agencies flooded the home.  3-ER-348, 354.

Finally, more than two hours into the search, an agent read Mr. Liddy his *Miranda* rights.  Questioning continued until Mr. Liddy's wife told the agents she wanted to make a call with Mr. Liddy "*in*

64

*private*." 3-ER-355; R4 at 4:07. The agents purported to allow them to do so, but in fact, followed them and attempted to eavesdrop. 3-ER-355; R4 at 4:20. The recordings reveal the agents whispering: "I guarantee we probably shouldn't let them talk." "They'll probably talk to an attorney." "I think we can hear through the window upstairs." "I'm going to see if I can listen in." R4 5:21-6:24.

The Liddys then called an attorney. 3-ER-355. Shortly thereafter, agents handcuffed Mr. Liddy and brought him to jail. 3-ER-356. Just before the recordings end, the agents can be heard privately mocking him. R6 38:30-39:00.

Mr. Liddy moved to suppress his pre-*Miranda* statements, especially those from before he was told he could leave. 3-ER-320.[26] The district court denied the motion, concluding "Liddy was not in custody during his interrogation, therefore no *Miranda* warnings were required." 1-ER-34. The court erred.

---

[26] He also moved to suppress the post-*Miranda* statements. However, because those statements were not part of the trial, Mr. Liddy will not address them unless the government raises the issue.

65

2. <u>The interrogation was custodial</u>.

    a. *The reasonable person standard for in-home interrogations*.

The prosecution is prohibited from introducing any "statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Doody v. Ryan*, 649 F.3d 986, 1002 (9th Cir. 2011) (en banc). In making the requisite showing, the government bears "a heavy burden." *Miranda v. Arizona*, 384 U.S. 436, 475 (1966).

Specifically, when questioning occurs without *Miranda* warnings, the government must demonstrate the interaction was non-custodial. *See id.* The essential question is: "would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave[?]" *Thompson v. Keohane*, 516 U.S. 99, 112 (1995).

This is "an objective test." *Id.* "[T]aking into account the totality of the circumstances, [the court] must decide whether a reasonable person in [the suspect's] position would have **felt deprived of his freedom of**

**action in any significant way**, such that he would not have felt free to terminate the interrogation." *Craighead*, 539 F.3d at 1082.[27]

In applying this standard, the Court has recognized, "interrogation[s] conducted within the suspect's home" raise unique concerns. *Id.* In particular, "[i]f a reasonable person is interrogated inside his own home and is told he is 'free to leave,' where will he go? The library? The police station? He is already in the most constitutionally protected place on earth." *Id.* at 1083. "To be 'free' to leave is a hollow right if the one place the suspect cannot go is his own home." *Id.*

> b. *A reasonable person in Mr. Liddy's position would not have felt free to leave.*

That is the precise situation Mr. Liddy found himself in. From the beginning of the encounter:

- Three agents from two different agencies entered Mr. Liddy's home dressed in tactical gear, with their guns on display. 3-ER-352.

- Mr. Liddy was in his sleepwear, and his wife was sleeping upstairs. 3-ER-352.

---

[27] That Mr. Liddy was a civil-law attorney is an impermissible consideration. *See J.D.B. v. North Carolina*, 564 U.S. 261, 271 (2011) (the knowledge of the "particular suspect subjected to police questioning" is irrelevant). In any event, he had no experience with criminal law.

67

- The agents almost immediately confronted him with evidence of a child pornography offense, a particularly troubling crime. *E.g.*, 5-ER-952 ("We're more concerned about some -- some child stuff."); 957 ("You know, I have a concern about some pictures that were exchanged using that account").

- Then, without telling Mr. Liddy he was free to leave, or that he was not under arrest, and without *Miranda* warnings, the agents launched into questioning about the alleged offense. *E.g.*, 5-ER-951 ("Have you ever sent any pictures of any girls under the age of 18?"); 954 ("we work, you know, child pornography-type stuff, so has any of that ever come across your screen?").

- This initial questioning took place in isolation and lasted approximately 40 minutes, during which Mr. Liddy was confined to the kitchen with an agent within arm's reach. 5-ER-354.

- The agents had control over Mr. Liddy's phone during questioning. 3-ER-350, 419. As his declaration explained, "the agents took control of my phone and iPad, so even if I left, I would have no way to communicate." 3-ER-354.

- Nor could Mr. Liddy withdraw from the police *within* his own home. And at least one agent always guarded him, even insisted on watching him while he used the bathroom. 3-ER-353-55.

Under the totality of these circumstances, the interrogation was custodial. Mr. Liddy was "deprived of his freedom of action in a[] significant way." *Craighead*, 539 F.3d at 1083. A reasonable person in his position would not have felt free to leave.

68

c. *Craighead is dispositive for Mr. Liddy*.

*Craighead* proves the point. There, eight armed officers from three agencies searched Craighead's home as part of a child pornography investigation. *Id.* at 1078. As here, the officers entered the home wearing "raid vests." *Id.* Upon entry, they did *not* handcuff Craighead or otherwise physically restrain him. *See id.* Instead, they "directed [him] to a storage room at the back of his house, where [they] could have a private conversation." *Id.* The officers shut the door and one of them "stood leaning against the wall near the exit[.]" *Id.*

Although the officers did not provide *Miranda* warnings, before questioning they told Craighead "he was not under arrest, that any statement he might make would be voluntary, and that he would not be arrested that day regardless of what information he provided. [One agent] also testified that she told Craighead that he was free to leave." *Id.* During the interview, Craighead confessed to downloading child pornography. *See id.* at 1079.

He moved to suppress his statements, arguing they were obtained in violation of *Miranda*. *See id.* at 1080. The district court denied the motion, concluding the interrogation was not custodial. *See id.*

69

This Court reversed. It determined that, in the context of the in-home interrogation at issue, four factors were particularly relevant:

> "(1) the number of law enforcement personnel and whether they were armed;
>
> (2) whether the suspect was at any point restrained, either by physical force or by threats;
>
> (3) whether the suspect was isolated from others; and
>
> (4) whether the suspect was informed that he was free to leave or terminate the interview, and the context in which any such statements were made."

*Id.* at 1084. Examining the totality of the circumstances through the lens of these factors, the Court concluded a reasonable person in the defendant's position would not have felt free to leave.

The same is true here. Mr. Liddy was immediately outnumbered by three armed agents who appeared to be from different agencies. And when he asked "to move around the house for brief periods [the agents] insist[ed] on escorting and monitoring him at all times." *Id.* at 1085. He was not allowed to use the bathroom or change his clothes without agents watching. 3-ER-352-55.

As *Craighead* held, "when law enforcement agents conduct an in-home interrogation while conducting a lawful search of the home,

70

physical control of the suspect will be necessary to preserve evidence and protect the safety of the agents. *The fact that these precautions may be necessary to the success of the lawful search does not lessen their tendency to make a reasonable person believe he is in custody.*" *Id.* at 1086; *see also United States v. Beraun-Panez*, 812 F.2d 578, 580 (9th Cir. 1987) (explaining that "psychological restraints" can be "just as binding" as physical ones).

Further, Mr. Liddy was in fact isolated from his wife during the initial questioning. He was alone in the kitchen with the armed agents within arm's length. And he was never informed he could terminate the interview. In this way, the circumstances here were more custodial than in *Craighead*. There, the suspect was told *before* any questioning that he was free to leave and that any statements he might make would be voluntary – none of which the agents told Mr. Liddy until after he made the statements, which the district court found incriminatory. *See* R1 at 36:10.

Moreover, unlike the situation in *Craighead*, where the questioning was conducted as incident to an ongoing search, 539 F.3d at 1078, the agents here questioned Mr. Liddy before the search team arrived and

71

before he was told there was a search warrant. Thus, the agents' close control over Mr. Liddy's movements was designed solely to intimidate and isolate him; it was not to protect an ongoing search.

In short, no reasonable person in Mr. Liddy's position would feel free to leave (and certainly not during the period before he was told he could). Rather, he or she would feel compelled to remain. And custody lies in that compulsion.

In any event, where was Mr. Liddy to go? It was early in the morning, his wife was asleep upstairs, the agents had his phone, he was still in his sleepwear, and his car was blocked by the agents' vehicles. Was he going to walk aimlessly through the streets as agents woke his wife and searched their home? That is not a reasonable alternative.

Indeed, "an agent's statement that a suspect is free to leave may have more or less resonance with the suspect depending on whether he can leave the interrogation site and retreat to the safety of his home or whether his home is in fact the locus of police activity." *Id.* at 1088. Here, because Mr. Liddy's home was the locus, he had nowhere to retreat. The free-to-leave statement not only came too late, it was of no comfort.

72

The district court overlooked this point. Citing the calm demeanor of the agents (who knew they were being recorded, whereas Mr. Liddy did not), the court believed "the atmosphere was not one of police dominance and coercion." 1-ER-34. But as the California Court of Appeal has aptly stated: "a pleasant and conversational tone of voice does not negate the inherently coercive nature of this interrogation in the absence of *Miranda* warnings." *People v. Saldana*, 19 Cal. App. 5th 432, 460 (2018).

This was certainly true for Mr. Liddy. Accordingly, because the pre-*Miranda* interrogation was custodial, but the agents failed to provide the requisite warnings – or any warnings at all before questioning commenced – Mr. Liddy's statements should have been suppressed. Given the district court's express reliance on the statements in convicting Mr. Liddy, there is no credible claim of harmlessness. His conviction cannot stand.

73

## CONCLUSION

The Court should vacate Mr. Liddy's conviction.

Respectfully submitted,

*s/ Devin Burstein*

March 3, 2021

Devin Burstein
Warren & Burstein

74

## <u>CERTIFICATE OF RELATED CASES</u>

Counsel is unaware of any related cases pending before this Court,

which should be considered in this appeal.

Respectfully submitted,

Dated: March 3, 2021
<u>*s/ Devin Burstein*</u>
Devin Burstein
Warren & Burstein
Attorneys for Defendant-Appellant

75

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** _____20-50238_____

I am the attorney or self-represented party.

**This brief contains <u>13,803</u> words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties;
    [ ] a party or parties are filing a single brief in response to multiple briefs; or
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** *s/ Devin Burstein*_____ **Date** 03/03/2021
*(use "s/[typed name]" to sign electronically-filed documents)*

# ADDENDUM

> United States Code Annotated
>   Title 18. Crimes and Criminal Procedure (Refs & Annos)
>     Part I. Crimes (Refs & Annos)
>       Chapter 110. Sexual Exploitation and Other Abuse of Children (Refs & Annos)

18 U.S.C.A. § 2252

§ 2252. Certain activities relating to material involving the sexual exploitation of minors

Effective: December 7, 2012
Currentness

**(a)** Any person who--

**(1)** knowingly transports or ships using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means including by computer or mails, any visual depiction, if--

**(A)** the producing of such visual depiction involves the use of a minor engaging in sexually explicit conduct; and

**(B)** such visual depiction is of such conduct;

**(2)** knowingly receives, or distributes, any visual depiction using any means or facility of interstate or foreign commerce or that has been mailed, or has been shipped or transported in or affecting interstate or foreign commerce, or which contains materials which have been mailed or so shipped or transported, by any means including by computer, or knowingly reproduces any visual depiction for distribution using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce or through the mails, if--

**(A)** the producing of such visual depiction involves the use of a minor engaging in sexually explicit conduct; and

**(B)** such visual depiction is of such conduct;

**(3)** either--

**(A)** in the special maritime and territorial jurisdiction of the United States, or on any land or building owned by, leased to, or otherwise used by or under the control of the Government of the United States, or in the Indian country as defined in section 1151 of this title, knowingly sells or possesses with intent to sell any visual depiction; or

**(B)** knowingly sells or possesses with intent to sell any visual depiction that has been mailed, shipped, or transported using any means or facility of interstate or foreign commerce, or has been shipped or transported in or affecting interstate or foreign commerce, or which was produced using materials which have been mailed or so shipped or transported using any means or facility of interstate or foreign commerce, including by computer, if--

**(i)** the producing of such visual depiction involves the use of a minor engaging in sexually explicit conduct; and

**(ii)** such visual depiction is of such conduct; or

**(4)** either--

**(A)** in the special maritime and territorial jurisdiction of the United States, or on any land or building owned by, leased to, or otherwise used by or under the control of the Government of the United States, or in the Indian country as defined in section 1151 of this title, knowingly possesses, or knowingly accesses with intent to view, 1 or more books, magazines, periodicals, films, video tapes, or other matter which contain any visual depiction; or

**(B)** knowingly possesses, or knowingly accesses with intent to view, 1 or more books, magazines, periodicals, films, video tapes, or other matter which contain any visual depiction that has been mailed, or has been shipped or transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce, or which was produced using materials which have been mailed or so shipped or transported, by any means including by computer, if--

**(i)** the producing of such visual depiction involves the use of a minor engaging in sexually explicit conduct; and

**(ii)** such visual depiction is of such conduct;

shall be punished as provided in subsection (b) of this section.

**(b)(1)** Whoever violates, or attempts or conspires to violate, paragraph (1), (2), or (3) of subsection (a) shall be fined under this title and imprisoned not less than 5 years and not more than 20 years, but if such person has a prior conviction under this chapter, section 1591, chapter 71, chapter 109A, or chapter 117, or under section 920 of title 10 (article 120 of the Uniform Code of Military Justice), or under the laws of any State relating to aggravated sexual abuse, sexual abuse, or abusive sexual conduct involving a minor or ward, or the production, possession, receipt, mailing, sale, distribution, shipment, or transportation of child pornography, or sex trafficking of children, such person shall be fined under this title and imprisoned for not less than 15 years nor more than 40 years.

**(2)** Whoever violates, or attempts or conspires to violate, paragraph (4) of subsection (a) shall be fined under this title or imprisoned not more than 10 years, or both, but if any visual depiction involved in the offense involved a prepubescent minor or a minor who had not attained 12 years of age, such person shall be fined under this title and imprisoned for not more than 20 years, or if such person has a prior conviction under this chapter, chapter 71, chapter 109A, or chapter 117, or under section 920 of Title 10 (article 120 of the Uniform Code of Military Justice), or under the laws of any State relating to aggravated sexual abuse, sexual abuse, or abusive sexual conduct involving a minor or ward, or the production, possession, receipt, mailing, sale, distribution, shipment, or transportation of child pornography, such person shall be fined under this title and imprisoned for not less than 10 years nor more than 20 years.

**(c) Affirmative defense.**--It shall be an affirmative defense to a charge of violating paragraph (4) of subsection (a) that the defendant--

**(1)** possessed less than three matters containing any visual depiction proscribed by that paragraph; and

**(2)** promptly and in good faith, and without retaining or allowing any person, other than a law enforcement agency, to access any visual depiction or copy thereof--

**(A)** took reasonable steps to destroy each such visual depiction; or

**(B)** reported the matter to a law enforcement agency and afforded that agency access to each such visual depiction.

## CREDIT(S)

(Added Pub.L. 95-225, § 2(a), Feb. 6, 1978, 92 Stat. 7; amended Pub.L. 98-292, § 4, May 21, 1984, 98 Stat. 204; Pub.L. 99-500, Title I, § 101(b) [Title VII, § 704(b)], Oct. 18, 1986, 100 Stat. 1783-75; Pub.L. 99-591, Title I, § 101(b) [Title VII, § 704(b)], Oct. 30, 1986, 100 Stat. 3341-75; Pub.L. 100-690, Title VII, § 7511(b), Nov. 18, 1988, 102 Stat. 4485; Pub.L. 101-647, Title III, § 323(a), (b), Nov. 29, 1990, 104 Stat. 4818, 4819; Pub.L. 103-322, Title XVI, § 160001(d), (e), Title XXXIII, § 330010(8), Sept. 13, 1994, 108 Stat. 2037, 2143; Pub.L. 104-208, Div. A, Title I, § 101(a) [Title I, § 121[5]], Sept. 30, 1996, 110 Stat. 3009-30; Pub.L. 105-314, Title II, §§ 202(a), 203(a), Oct. 30, 1998, 112 Stat. 2977, 2978; Pub.L. 108-21, Title I, § 103(a)(1)(B), (C), (b)(1)(C), (D), Title V, § 507, Apr. 30, 2003, 117 Stat. 652, 653, 683; Pub.L. 109-248, Title II, § 206(b)(2), July 27, 2006, 120 Stat. 614; Pub.L. 110-358, Title I, § 103(a)(3), (b), (c), Title II, § 203(a), Oct. 8, 2008, 122 Stat. 4002, 4003; Pub.L. 112-206, § 2(a), Dec. 7, 2012, 126 Stat. 1490.)

18 U.S.C.A. § 2252, 18 USCA § 2252
Current through P.L. 116-259. Some statute sections may be more current, see credits for details.

**End of Document** © 2021 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW © 2021 Thomson Reuters. No claim to original U.S. Government Works. 3